Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

**FILED**

DEC -7 2001
DEC 7 2001

CLERK, U.S. DISTRICT COURT
CENT... DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

**ENTERED**

DEC 10 2001

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA OFFICE
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| OAKLEY, INC. a Washington corporation, | SA CV 01-1065 AHS(MLGx) |
| Plaintiff, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF PRELIMINARY INJUNCTION |
| SUNGLASS HUT INTERNATIONAL, a Delaware corporation, LENSCRAFTERS, INC., a Delaware corporation, RAY BAN SUN OPTICS, a Delaware corporation, LUXOTTICA GROUP S.p.A., an Italian corporation, and LEONARDO DEL VECCHIO, an individual, | |
| Defendants. | |

Docketed
Copies / NTC Sent
JS - 5 / JS - 6
JS - 2 / JS - 3
ENTER ON ICMS

DEC 10 2001

I. **PROCEDURAL HISTORY**

1.    On November 6, 2001, Plaintiff Oakley, Inc.

("Oakley") filed this lawsuit for patent and trade dress

infringement against Defendants Sunglass Hut International,

Lencrafters, Inc, Ray Ban Sun Optics, Luxottica Group S.p.A., and

1  Leonardo Del Vecchio.

2       2.   On November 13, 2001, this lawsuit was transferred
3  to the docket of the undersigned Judge of this Court pursuant to
4  General Order 224 based upon the co-pendency of other related
5  cases involving the same patent.

6       3.   On November 14, 2001, Oakley filed an application
7  for a temporary restraining order and an order to show cause why
8  a preliminary injunction should not issue.  Oakley's application
9  was accompanied by supporting declarations.  Defendants filed a
10  counterstatement on November 16, 2001.  Oakley filed a reply on
11  November 19, 2001 and Defendants filed a surreply on November 20,
12  2001.

13       4.   The Court entered a temporary restraining order
14  against Defendants on November 20, 2001, prohibiting Defendants
15  from making, importing, selling, or offering to sell any products
16  with green or blue lens coatings that infringe Oakley's U.S.
17  Patent No. 5,054,902 ("the '902 patent").  The Court also entered
18  an Order to Show Cause why a preliminary injunction should not
19  issue.

20       5.   On November 27, 2001, Defendants filed their
21  Memorandum in Opposition to Oakley's Motion for Preliminary
22  Injunction with supporting declarations.

23       6.   On November 28, 2001, Oakley filed its Reply
24  Memorandum with supporting declarations.  On November 30, 2001,
25  the Court held a hearing on the Order to Show Cause.  The Court,
26  having carefully considered all of the evidence of record and
27  argument of counsel, granted Oakley's motion for preliminary
28  injunction on the condition that Oakley post an undertaking in

1  the amount of $100,000 by Monday, December 3, 2001.  Plaintiff

2  lodged proposed Findings of Fact and Conclusions of Law in

3  Support of Preliminary Injunction on December 3, 2001.  On

4  December 5, 2001, Defendants lodged proposed Findings of Fact and

5  Conclusions of Law and Objections to Plaintiff's proposed

6  Findings of Fact and Conclusions of Law.  Having considered the

7  foregoing, the Court enters the following findings of fact and

8  conclusions of law in support of the issuance of a preliminary

9  injunction against Defendants.

10       **II. LEGAL STANDARD GOVERNING PRELIMINARY INJUNCTIONS**

11                      **IN PATENT CASES**

12       7.    The grant or denial of a preliminary injunction

13  requires the analysis of four factors: 1) likelihood of success

14  on the merits; 2) irreparable harm if an injunction is not

15  granted; 3) the balance of hardships; and 4) the impact on the

16  public interest.  See Amazon.com, Inc. v. Barnesandnoble.com,

17  Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001).  No single factor,

18  taken individually, is dispositive.  Each factor must be weighed

19  in view of the other factors and against the relief requested.

20  Id.

21       8.    In order to show a reasonable likelihood of

22  success on the merits in a patent case, a plaintiff must show

23  that in light of the presumptions and burdens that will inhere at

24  trial on the merits: 1) the plaintiff will likely prove that the

25  defendant infringes the patent, and 2) the plaintiff's

26  infringement claim will likely withstand the defendant's

27  challenges to the validity and enforceability of the patent.  See

28  Amazon.com, 239 F.3d at 1350.  "If [the defendant] raises a

1  substantial question concerning either infringement or validity,

2  *i.e.*, asserts an infringement or invalidity defense that the

3  patentee cannot prove 'lacks substantial merit,' the preliminary

4  injunction should not issue." <u>Id.</u> at 1350-51.

5  ### III. LIKELIHOOD OF SUCCESS ON THE MERITS AT TRIAL

6      9.   In its application for temporary restraining order

7  and request for preliminary injunction, Oakley asserted

8  Claims 1 and 2 of the '902 patent against Defendants' sunglasses

9  with blue and green lenses.[1]  See Feinberg Decl. ¶ 10.  The text

10  of Claims 1 and 2 is set forth below:

11      1.   A lens for sunglasses to be worn by a wearer,

12      comprising:

13          a light transmissive substrate constituting the

14      lens body, and having a first side for facing the

15      wearer and a second side of facing outwardly from the

16      wearer,

17          a semireflective layer intimately bonded to the

18      second side, and

19          a dielectric layer over said semireflective layer,

20      said dielectric layer being of substantially uniform

21      thickness,

22          the reflectance of said semireflective layer and

23      the thickness of said dielectric layer producing, at

24      one or more wavelengths, a differential effect in

25      intensity, of reflected light incident upon said lens

26      from the direction faced by said second side, by

27  ─────────────────

28  [1] The parties' memoranda and supporting declarations sometimes
refer to the green lenses as "Emerald" and the blue lenses as
"Ice."

4

1    interference between incident light reflected from said

2    dielectric layer and light transmitted through said

3    dielectric layer, and reflected from said

4    semireflective layer, said differential effect altering

5    the spectral distribution of light in an amount for

6    producing a vivid colored appearance formed by said two

7    layers when viewing toward the wearer from the

8    direction faced by said second side.

9    2.    A lens according to Claim 1, wherein said

10   semireflective layer is a metal layer having a

11   reflectance under approximately 30%.

12   **A.**      **Patent Infringement**

13   10.   Infringement analysis requires the court to first

14   determine the meaning of the claim and then compare the properly

15   construed claim to the accused device.  See Amazon.com, 239 F.3d

16   at 1350.  All claims must be construed in light of the

17   specification and the prosecution history.  See  Grain Processing

18   Corp. v. Amer. Maize-Products Co., 840 F.2d 902, 908 (Fed. Cir.

19   1988).

20        **1.    Background of '902 Patent**

21   11.   The named inventor of the '902 patent is Dr.

22   William J. King.  Von Hoffman Decl. ¶ 2.  The Patent Office

23   issued the '902 patent on October 8, 1991 after approximately 16

24   years of prosecution.  In 1995, King threatened to sue Oakley for

25   infringement of the '902 patent, whereupon Oakley investigated

26   the validity of the '902 patent.  Oakley discovered prior art

27   that potentially raised new questions of patentability not

28   addressed by the PTO and requested that the PTO re-examine the

1  '902 patent in light of the newly-discovered prior art.   Id. ¶¶
2  4, 5.

3       12.   Oakley's request for re-examination was granted.
4  Oakley also obtained an option to purchase the '902 patent should
5  it survive the reexamination.   Id.   Oakley exercised its option
6  to purchase the '902 patent after it learned that the claims of
7  the '902 patent would survive the re-examination process.   On
8  June 23, 1998, the PTO issued a Re-examination Certificate
9  confirming the patentability of all original claims 1-8 of the
10  '902 patent without requiring substantive claim amendments and
11  adding additional claims 9-39.   Id. at ¶ 12-13.

12       **2.   Claim 1 of the '902 Patent**

13       13.   Claim 1 discloses that vivid colors can be
14  produced by controlling the thicknesses of the dielectric and
15  semireflective layers of the lens.   See '902 patent col. 23-24.
16  The specification of the '902 patent provides a table of the
17  appropriate thickness of the dielectric layers to achieve various
18  colors and examples of a preferred reflectivity of 20% or 30% for
19  the semireflective layer and.   See '902 patent Figs. 6(a), 6(b),
20  7 and Table I; Feinberg Supp. Decl. ¶ 25.

21       14.   In addition, the '902 patent provides specific
22  equations for calculating the differential effect, which is a
23  measure of the degree to which a color would be vivid.   See,
24  e.g., id. col. 7:20-22.

25       15.   The '902 specification also distinguishes its
26  colors from weaker colors produced by prior art using highly
27  reflective mirror-like surfaces.   The '902 patent states that,
28  "[i]ntereference colors on such highly reflecting metal surfaces

therefore tend to be weak or washed out to the eye because of the small differential intensities involved." '902 patent, col. 10: 11-14.

16.   During the prosecution of the '902 patent, King distinguished his patent from the prior art Apfel reference having a highly reflective layer.   King stated:

> Figure 1, and the transmission and reflection graphs
> Figures 2-5 of Apfel, illustrate the only structure of
> Apfel which resembles Applicant's
> substrate/metal/dielectric construction. Those figures
> relate to a thick metal layer (675 Angstroms of
> Inconel) which is essentially a mirror having
> approximately a 94% reflectance, and a $TIO_2$ overcoat.
> While reflected color (magneta) is indicated for one
> embodiment, the graph Figure 4 does not indicate a
> strong color peak, and Apfel expressly indicates that
> he uses a multi-pair stack (Figure 6) in order to
> achieve strong reflective color (Col. 3 lines 63-65).
> Thus, the vividly colored reflected light produced by
> interference with a simple two-layer construction as
> claimed in [King's application] is neither disclosed or
> suggested by Apfel." See Baumeister Decl., Ex. F at
> 107-08.

3.   **Infringement of the '902 patent**

17.   To literally infringe the '902 patent, Defendants' sunglass lenses must contain each limitation of the asserted claims.   See Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1247 (Fed. Cir. 2000).   The Court finds that Oakley will

1  likely succeed at trial in proving that Defendants' green and

2  blue lenses literally infringe Claims 1 and 2 of the '902 patent.

3                    a.   **Defendants' Products**

4          18.   The structure and composition of Defendants'

5  lenses were not disputed by the parties.  Defendants' blue and

6  green lenses have a polycarbonate lens base with a polysiloxane

7  hardcoating, a chromium layer applied over the hardcoated

8  lens base, and a silicon dioxide layer applied over the

9  semi-reflective layer.  See Feinberg Decl. ¶ 9.

10                   b.   **Infringement of Claim 1**

11         19.   Defendants raise two non-infringement arguments:

12 (i) the semi-reflective layer in their lenses is not "intimately

13 bonded" to the substrate or lens body; and (ii) their lenses

14 cannot infringe because they have "color peaks" like the prior

15 art Apfel patent or because the lenses are made by the same

16 process utilized by Foster Grant or STCV, which are alleged to be

17 prior art.

18         20.   Defendants' "intimately bonded" argument is

19 premised on the assumption that the substrate or lens body in

20 Defendants' lenses is the underlying polycarbonate without the

21 polysiloxane hardcoating.  The Court finds that Defendants'

22 lenses have a light transmissive "substrate" or "lens body" made

23 of polycarbonate and polysiloxane. These materials together are

24 appropriately treated as the claimed substrate or lens body

25 because, in the context of the '902 patent, they have virtually

26 identical optical characteristics.  See Feinberg Supp. Decl. ¶¶

27 4-8.

28         21.   One of skill in the art would consider

8

1  polycarbonate coated with a polysiloxane hardcoating as a single

2  monolithic substrate or lens body.  See DeBell Decl. ¶ 5.

3         22.  The doctrine of claim differentiation confirms

4  that the substrate or lens body of Claim 1 should not be limited

5  to a single-layer material.  The Federal Circuit has held:

6         [i]t is settled law that when a patent claim does not

7         contain a certain limitation and another claim does,

8         that limitation cannot be read into the former claim in

9         determining either validity or infringement.

10 SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1122 (Fed.

11 Cir. 1985) (en banc).  Claim 7 of the '902 patent, which is

12 dependent upon Claim 1, requires "a light transmissive substrate

13 constituted by a substrate formed of a single optically

14 homogenous light transmissive material."  Thus, the broader

15 independent Claim 1 must be understood to encompass a lens body

16 having more than one optically homogenous light transmissive

17 material.

18        23.  The Court finds that the dielectric layer

19 thicknesses of the accused products correspond to the observed

20 colors predicted by Table I of the '902 patent. See Feinberg

21 Decl. ¶ 10; '902 patent, cols. 18-19.

22        24.  Defendants also point to the prosecution history

23 where King distinguished the Apfel patent.  Defendants assert

24 that "King's argument over Apfel . . . constitutes clear

25 prosecution history estoppel" and that Oakley should be barred

26 from asserting infringement against the accused products because

27 their "color peaks" are below Apfel.  Opp. at 11.  However, King

28 distinguished the Apfel patent not only as to color, but also to

the structure for achieving the color.  For example, the prosecution history shows that King explained that Apfel did not have a semi-reflective layer, but rather a highly reflective layer.  See Baumeister Decl. Ex. F at 107.  Defendants have not raised a substantial question that their lenses are like the lenses of Apfel and cannot rely upon such similarity as a "non-infringement" argument.

25.  Defendants also assert that their lenses are made by the same process as Foster Grant or STCV.  The Court finds that Defendants have not sufficiently proven at this stage the structure of the Foster Grant or STCV lenses.

26.  Oakley has made a strong showing that Defendants' green and blue lenses literally infringe Claim 1 and that Defendants' non-infringement arguments lack substantial merit.

### 3.  Infringement of Claim 2

27.  Claim 2 is dependent upon Claim 1, adding the requirement that the semi-reflective layer must be a metal layer having less than approximately 30% reflectivity.

28.  Oakley's technical expert reported that the chromium semi-reflective layer in each of the Defendants' lenses has a reflectivity of less than 30%.  See Feinberg Decl. ¶ 10; Feinberg Supp. Decl. ¶ 30.

29.  Defendants' technical expert, without performing any reflectivity measurements of his own, reported a "calculated" reflectivity "in excess of 50%."  See Baumeister Decl. ¶ 27. Defendants' expert did not describe the details of his calculation.  See id.  On reply, Oakley's expert explained that the calculation of Defendants' expert apparently assumed the

1   layer was made of pure chromium under ideal conditions, ignoring

2   variables that may be introduced during the manufacturing

3   process.  See Feinberg Supp. Decl. ¶ 28.  Moreover, a calculated

4   reflectivity for the metal layer of greater than 50% by itself is

5   much greater than the measured reflectivity from the lens as a

6   whole.  See Feinberg Supp. Decl. ¶ 29; Feinberg Decl. Ex. C.

7          30.   In view of the foregoing, the Court finds that

8   Oakley has made a strong showing that Defendants infringe Claim 2

9   and that Defendants' non-infringement arguments lack substantial

10  merit.

11  **B.**          **Patent Validity**

12         31.   Validity challenges during preliminary injunction

13  proceedings may succeed if they raise substantial questions of

14  invalidity, even on evidence that would not suffice to support a

15  judgment of invalidity at trial.  Amazon.com, 239 F.3d at 1358.

16  Vulnerability is the issue at the preliminary injunction stage,

17  while validity is the issue at trial.  Id.  The showing of a

18  substantial question as to invalidity thus requires less proof

19  than the clear and convincing showing necessary to establish

20  invalidity itself.  Id.

21         32.   The patentee seeking a preliminary injunction must

22  present a clear case supporting the validity of the patent but

23  need not establish the patent's validity beyond question.  Id. at

24  1359.  Such a case might be supported, for example, by showing

25  that the patent in suit had successfully withstood previous

26  validity challenges in other proceedings or from a long period of

27  industry acquiescence in the patent's validity.  Id.

28         33.   The claims of the '902 patent are presumed to be

11

valid.  See 35 U.S.C. § 282.  Defendants have not raised a

substantial question as to the invalidity of the '902 patent.

Furthermore, the 16-year prosecution history of the '902 patent

and the PTO's 1998 Re-examination Certificate confirming

patentability supports Plaintiff's burden of showing a clear case

of validity.

### 1.  Validity of Claim 1

#### a.  Anticipation under 35 U.S.C. § 102

34.  Defendants assert that the '902 patent is invalid

under 35 U.S.C. § 102 as anticipated by each of four different

items of prior art.  The Court finds that each of Defendant's

invalidity arguments lacks substantial merit.

#### 1)  Foster Grant Lenses

35.  Defendants' primary invalidity argument is that

Claim 1 of the '902 patent is anticipated by prior art lenses

manufactured by Foster Grant before the filing of the

'902 patent.  Defendants allege that the declarations of Theodore

Haddad, Chet Fantozzi, James LeBlanc, and Joe Babineau

(collectively the "Foster Grant Declarations") show that the

invention of Claim 1 of the '902 patent is anticipated by lenses

manufactured by Foster Grant before the '902 patent was filed.

36.  Under 35 U.S.C. § 102(b), a person is not

entitled to a patent if "the invention was ... described in a

printed publication in this or a foreign country or in public use

or on sale in this country more than one year prior to the date

of the application for patent in the United States."  The '902

patent application was continued from a previous application

filed on December 29, 1975.  Thus, the critical date is December

1  29, 1974.

2      37.  A prior art reference anticipates a patent claim

3  if the reference discloses, either expressly or inherently, all

4  of the limitations of the claim.  Finnigan Corp. v. ITC, 180 F.3d

5  1354, 1365 (Fed. Cir. 1999).  In addition, the Supreme Court has

6  recognized that:

7        testimony concerning invalidating activities can be

8        'unsatisfactory' due to 'the forgetfulness of

9        witnesses, their liability to mistakes, their proneness

10        to recollect things as the party calling them would

11        have them recollect them, aside from the temptation to

12        actual perjury.

13  Finnigan Corp. v. ITC, 180 F.3d 1354, 1366 (Fed. Cir. 1999)

14  (quoting The Barbed Wire Patent, 143 U.S. 275, 285, 36 L. Ed.

15  154, 12 S. Ct. 443 (1892)).  Mere testimony concerning

16  invalidating activities is received with further skepticism

17  because such activities are normally documented by tangible

18  evidence such as devices, schematics, or other materials that

19  typically accompany the inventive process.  Finnigan, 180 F.3d at

20  1366.  Moreover, the need for corroboration exists regardless of

21  whether the party is interested in the outcome of the litigation

22  or is uninterested but is testifying on behalf of an interested

23  party.  Id. at 1367.

24      38.  The Court finds that the Foster Grant Declarations

25  do not present a substantial challenge to the validity of Claim 1

26  of the '902 patent.  At best, the Foster Grant declarations and

27  accompanying exhibits show that Foster Grant manufactured a two-

28  layer lens coating using chromium and silicon dioxide or silicon

1    monoxide.  See Haddad Decl. ¶ 6.

2         39.   This two-layer structure is not distinguishable

3    from that which the '902 patent itself discloses as prior art in,

4    for example, Figure 5(b).  The '902 patent explains that a vivid

5    color can only be established by carefully controlling the

6    thickness of the semi-reflective and dielectric layers so that

7    the amount of reflected light is sufficient to create a

8    differential effect in the desired wavelength, but not so great

9    as to "wash out" the color.  See '902 patent, col. 10, lines 13-

10   14.

11        40.   The Foster Grant declarations do not describe the

12   thickness of the chromium or silicon oxide layers or whether a

13   vivid color was achieved.  Claim 1 requires a dielectric layer of

14   substantially uniform thickness but the declarations do not

15   provide the thicknesses of the dielectric layers used by Foster

16   Grant.  The Foster Grant declarants' recollections that the

17   colors on the Foster Grant lenses were "brilliant" are

18   insufficient to show that the chromium and silicon oxide layers

19   were deposited in thicknesses appropriate to create a

20   "differential effect altering the spectral distribution of light

21   in an amount for producing a vivid colored appearance" as

22   required by Claim 1.

23        41.   In addition to the Court's finding that the Foster

24   Grant declarations fail to show that every limitation of Claim 1

25   of the '902 patent was present in the prior art, the Court finds

26   the testimony insufficiently corroborated to raise a substantial

27   question as to the validity of Claim 1 of the '902 patent.  In

28   particular, there is no corroboration that would distinguish the

1. Foster Grant lenses from the admitted prior art of Figure 5(b) in

2. the '902 patent over which all claims were twice allowed.

3.     42. The declarations also do not provide any tangible

4. evidence of the Foster Grant lenses, such as the lenses

5. themselves, schematics, or other materials that "typically

6. accompany the inventive process." Finnigan, 180 F.3d at 1366.

7.     43. This is particularly true where, as here, the

8. nature of the claimed invention is such that it can only be fully

9. understood after detailed evaluation of microscopically thin

10. coating layers and not by casual observation of a product having

11. the appearance of a colored lens.

12.     44. While Defendants do not need to show clear and

13. convincing evidence, the Court finds under the totality of the

14. circumstances that there is insufficient corroboration of Mr.

15. Haddad's testimony to raise a substantial challenge to the

16. validity of the '902 patent.

17.         **2) STCV Lenses**

18.     45. Defendants next assert that lenses manufactured

19. by Ms. Lilliane Roche-Grasset, owner of a company known as

20. Technology/Moptic STCV ("STCV") anticipate Claim 1. Ms. Roche-

21. Grasset's declaration asserts that a chromium layer and a silicon

22. dioxide layer were deposited on sunglass lenses to create color

23. prior to the filing of the '902 patent. See Roche-Grasset Decl.

24. ¶¶ 2-4.

25.     46. Like Mr. Haddad's declaration, Ms. Roche-Grasset's

26. declaration fails to provide the relevant thicknesses of each of

27. the layers and is therefore no more probative than the admitted

28. prior art shown in Figure 5(b) of the '902 patent. Moreover, Ms.

1   Roche-Grasset's declaration provides no indication of the quality

2   of the color obtained and therefore provides no basis for the

3   Court to find that the colors obtained through the process

4   described created a "differential effect altering the spectral

5   distribution of light in an amount for producing a vivid colored

6   appearance" as required by Claim 1.  Accordingly, for the same

7   reasons discussed above with respect to the Foster Grant

8   declarations, the Court finds that Ms. Roche-Grasset's

9   declaration does not present a substantial challenge to the

10  validity of Claim 1 of the '902 patent.

11          47.   The Court also finds that, like the Foster Grant

12  declarations, there is insufficient corroboration of Ms. Roche-

13  Grasset's testimony to rise to the level necessary to present a

14  substantial challenge to the validity of the '902 patent.

15                    **3)    Ross Article**

16          48.   Defendants next assert that Claims 1 and 2 of the

17  '902 patent are anticipated by a German article written by

18  Dr. A. Ross ("the Ross article").  See Baumeister Decl. Ex. C.

19  Although the Ross article discusses depositing layers on eyeglass

20  lenses, like the Apfel patent which was considered by the PTO,

21  the Ross article fails to teach one of skill in the art how to

22  deposit the metal and dielectric layers in appropriate

23  thicknesses to achieve a "differential effect altering the

24  spectral distribution of light in an amount for producing a vivid

25  colored appearance" as required by Claim 1.

26          49.   In particular, the Ross article does not disclose

27  the claimed <u>semi</u>-reflective layer.  See Feinberg Supp. Decl. ¶¶

28  18-19.  The Ross article explains that the metal layer is

1  deposited in such a thickness as to produce a high reflectivity.

2  See *id.* Ex. C at p. 66; Feinberg Supp. Decl. ¶ 19.

3      50.   In addition, there is no disclosure or discussion in

4  the Ross article of the creation of a vivid color effect using

5  the layers required by Claim 1 of the '902 patent.  Indeed, the

6  highly reflective metal layers such as those discussed in the

7  Ross article were disclosed in Figure 5(b) the '902 patent as

8  prior art.  See Feinberg Supp. Decl. ¶ 21.  The '902 patent

9  explains that the interference color created by using the prior

10 art highly reflective metal layers "tend to be weak or washed out

11 to the eye because of the small differential intensities

12 involved."  '902 patent, col. 10, lines 13-14; Feinberg Supp.

13 Decl. ¶ 22.  The Court, thus, finds that the Ross article does

14 not present a substantial challenge to the validity of Claim 1 of

15 the '902 patent.

16              **4)   Apfel Patent**

17      51.   Finally, the Court finds Defendants' argument that

18 U.S. Patent No. 3,679,291 to Apfel ("Apfel") anticipates every

19 limitation of Claim 1 to be without substantial merit.  The PTO

20 twice examined the claims of the '902 patent in view of Apfel.

21 After both examinations, the PTO concluded that Apfel did not

22 anticipate or render obvious the subject matter of Claims 1 and

23 2.  Defendants have not shown the PTO's determination to be

24 incorrect.

25          **b.   Obviousness under 35 U.S.C. § 103**

26      52.   Defendants next assert that Claim 1 is obvious in

27 view of Apfel and the Ross article.  The Apfel patent was

28 considered by the PTO during the original prosecution and the

1  reexamination of the '902 patent.  By itself, Apfel does not

2  anticipate or render obvious any of the claims of the '902

3  patent.  As explained above, the Ross article is no more

4  instructive then Apfel.  The combination of Apfel and the Ross

5  article does not teach or suggest how to combine a

6  semi-reflective layer and a dielectric layer in thicknesses so as

7  to create a "differential effect altering the spectral

8  distribution of light in an amount for producing a vivid colored

9  appearance" in an eyeglass lens as required by Claim 1.  See

10  Feinberg Supp. Decl. ¶ 22.  The Court, thus, finds that the

11  combination of the Ross article and Apfel does not raise a

12  substantial question as to the validity of Claim 1 of the '902

13  patent.

14          53.  Defendants next assert that British Patent

15  No. 1,261,242 to Schindler ("Schindler") in combination with the

16  Ross article renders Claim 2 obvious.  Schindler discloses the

17  use of copper films to protect the eye from ultra-violet ("UV")

18  radiation.  Schindler is not related to the creation of a colored

19  effect by interference.  See Feinberg Supp. Decl. ¶ 23.  The

20  copper color of the lenses disclosed in Schindler is the result

21  of the reflection from the copper metal layer and not from an

22  interference effect as taught by the '902 patent.  Id.  Because

23  Schindler does not relate to the use of interference effects to

24  create a colored appearance, there is no suggestion in the prior

25  art to combine Schindler with any other reference to achieve the

26  invention of Claim 2 of the '902 patent.  See id. at ¶ 24.  The

27  Court finds that these references fail to raise a substantial

28  question as to the validity of Claim 2 of the '902 patent.

c.   Validity under 35 U.S.C. § 112

54.   Defendants next assert that Claims 1 and 2 of the '902 patent are invalid under 35 U.S.C. § 112 because they violate the definiteness and enablement requirements of § 112.

55.   The first paragraph of 35 U.S.C. § 112 states:

> The specification shall contain a written
> description of the invention, and of the manner
> and process of making and using it, in such clear,
> concise, and exact terms as to enable any person
> skilled in the art to which it pertains, or with
> which it is most nearly connected, to make and use
> the same, and shall set forth the best mode
> contemplated by the inventor of carrying out his
> invention.

56.   Defendants first assert that the '902 patent is invalid because it fails to meet the "enablement" requirement of 35 U.S.C. § 112, paragraph 1.  Defendants base their enablement argument on the testimony of Dr. King who Defendants assert acknowledged that the '902 patent was not sufficient to teach someone "how to make a differential effect which produces a vivid color appearance."  Opp. at p. 17.  For this proposition, Defendants cite page 32 of Dr. King's deposition.  Id.

57.   The Court disagrees that Dr. King's testimony can be read as an admission that the specification fails to enable Claim 1 of the '902 patent.  First, a reading of Dr. King's deposition suggests that Dr. King was not prepared to answer detailed questions regarding his patent.  Dr. King explained that he lacked an opportunity to review his patent and related

1  documents prior to his deposition.  See King Dep. at 8:8-21,

2  11:15-12:15.  Although the Court denied Oakley's motion to strike

3  Dr. King's deposition testimony, the Court declines to give Dr.

4  King's deposition testimony significant weight.

5      58.  Regardless of the preparedness of Dr. King, the

6  portion of the deposition to which Defendants cite does not

7  demonstrate that the specification of the '902 patent is non-

8  enabling.  In the portion of Dr. King's deposition that

9  Defendants quote, Dr. King explains that the purpose of his

10  patent is not merely to teach one of skill in the art how to

11  create a differential effect which produces a vivid color, but to

12  teach those of skill in the art how to use the thicknesses of the

13  various semireflective and dielectric layers to control the type

14  and vividness of the color produced.  See King Depo. at 32-33.

15      59.  The '902 patent specifically describes the use of

16  a semi-reflective metal having a reflectivity of less than 30% to

17  achieve the desired differential effect and offers several

18  examples of the thickness of the dielectric necessary to achieve

19  a desired color.  See '902 patent, Table I.

20      60.  Oakley's technical expert explains that one of

21  ordinary skill in the art of lens design would be able to

22  practice the claimed invention without undue experimentation

23  based on the detailed examples disclosed in the specification of

24  the '902 patent.  See Feinberg Supp. Decl. ¶ 26.

25      61.  The Court does not find substantial merit to

26  Defendants' argument that the '902 patent is invalid for failing

27  to meet the enablement requirement of 35 U.S.C. § 112.

28      62.  Defendants assert that the claims of the '902

patent are invalid because they are indefinite under 35 U.S.C. §
112, paragraph 2.   Paragraph 2 of 35 U.S.C. § 112 provides that
the "specification shall conclude with one or more claims
particularly pointing out and distinctly claiming the subject
matter which the applicant regards as his invention."

63.   Section 112 ¶ 2 is satisfied if one skilled in the
art would understand the bounds of the claim when read in light
of the specification.  Exxon Res. & Eng'g Co. v. United States,
265 F.3d 1371, 1375 (Fed. Cir. 2001).  A determination of claim
indefiniteness is a legal conclusion that is drawn from the
court's performance of its duty as a construer of patent claims.
Id. at 1376.  A claim is indefinite if it is insolubly ambiguous
and no narrowing construction can properly be adopted.  Id.  But,
if the meaning of a claim is discernible even though the task may
be formidable and the conclusion may be one over which reasonable
persons will disagree, the claim is sufficiently clear.  Id.

64.   Relying on the deposition testimony of Dr. King,
Defendants argue that Dr. King admitted that the phrase "vivid
colored appearance" is a subjective term and therefore
indefinite.  See Opp. at pp. 12-14.  The Court does not find that
Dr. King admitted that the term "vivid colored appearance" is
indefinite.  Dr. King explained that the term "vivid colored
appearance" can be defined in terms of the structure used to
create the color.  See King Dep. 64:2-9.  For example, the '902
patent specifically teaches various examples of a preferred
reflectivity of 20% or 30% for the semi-reflective layer and the
appropriate thickness of the dielectric layers to achieve various
colors.  See '902 patent Figs. 6(a), 6(b), 7 and Table I;

Feinberg Supp. Decl. ¶ 25.

65.   In addition, the '902 patent provides specific equations for calculating the differential effect, which is a measure of the degree to which a color would be vivid.  See, e.g., id. col. 7:20-22.

66.   The Court finds that one of skill in the art could discern what is meant by "vivid colored effect" from the specification of the '902 patent.  See Feinberg Supp. Decl. ¶ 25. Therefore, Defendants' argument that Claim 1 is invalid on the grounds of indefiniteness is without substantial merit.

C.        **Patent Enforceability**

67.   Defendants next argue that the '902 patent is unenforceable due to inequitable conduct before the PTO. Defendants assert that Dr. King mischaracterized the Apfel patent in his remarks to the PTO.  Specifically, Defendants allege that Dr. King intentionally misrepresented the Apfel patent as failing to achieve a vivid color.

68.   An inequitable conduct charge entails a two-part inquiry.  First, the defendant must demonstrate an intent to mislead the patent examiner.  See Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1261 (Fed. Cir. 2001).  Second, the defendant must show that the misrepresentation was material. Id.  If the threshold requirements of materiality and intent are established, the court must balance those findings to determine whether "the scales tilt to a conclusion that inequitable conduct occurred."  Id.

69.   Defendants presented no evidence that Dr. King intended to mislead the PTO.  In addition, Defendants have not

1  shown that any of Dr. King's statements to the PTO were false.

2        70.  Finally, Defendants' allegations that Dr. King

3  committed inequitable conduct in his discussion of the Apfel

4  patent is undermined by the fact that the Examiner had the Apfel

5  patent and could evaluate its teachings.  In Akzo N.V. v. ITC,

6  808 F.2d 1471 (Fed. Cir. 1986), the Federal Circuit stated:

7              The mere fact that [the applicant] attempted to

8              distinguish the [claimed] process from the prior

9              art does not constitute a material omission or

10             misrepresentation.  The examiner was free to reach

11             his own conclusion ... based on the art in front

12             of him.

13  Id. at 1482.  Accordingly, the Court finds that Defendants'

14  argument that Dr. King committed inequitable conduct in his

15  characterization of Apfel lacks substantial merit.

16        71.  For the foregoing reasons, the Court finds that

17  Oakley has made a strong showing that it is likely to succeed on

18  the merits of its patent infringement claim.  Oakley has further

19  shown that all of Defendants' invalidity arguments lack

20  substantial merit.

21                      **IV.  IRREPARABLE HARM**

22  **A.**        **Presumption of Irreparable Harm**

23        72.  Irreparable harm is presumed when a clear showing

24  of patent validity and infringement has been made.  See

25  Amazon.com, 239 F.3d at 1350.  This presumption derives in part

26  from the finite term of the patent grant, for patent expiration

27  is not suspended during litigation, and the passage of time can

28  work irremediable harm.  Id.  As discussed above, the Court finds

1 | that Oakley has made a clear showing of infringement and
2 | validity.  The Court, thus, finds that Oakley is entitled to a
3 | presumption of irreparable harm.

4 | **B.**        **Actual Irreparable Harm**

5 |          73.  In addition to the presumption of irreparable
6 | harm, the Court also finds that Oakley will in fact suffer
7 | irreparable harm if the preliminary injunction does not issue.
8 | If Defendants are permitted to continue to sell their blue and
9 | green colored sunglass lenses during the pendency of this lawsuit
10 | they will erode Oakley's exclusivity and goodwill associated with
11 | these products.  See Bowers Supp. Decl. ¶ 16.

12 |          74.  Defendants assert that Oakley cannot establish
13 | irreparable harm because Oakley has licensed the '902 patent.
14 | Although Oakley has issued a license under the '902 patent, an
15 | examination of the license reveals that Oakley did not license
16 | anyone to manufacture lenses under the '902 patent in competition
17 | with Oakley.  The license identified by Defendants merely grants
18 | a licensee the right to sell products using lenses Oakley
19 | manufactured.  See Baden Decl. ¶ 4.  Because Oakley has not
20 | licensed the '902 patent in a manner inconsistent with Oakley's
21 | exclusivity over the technology of the '902 patent, the license
22 | identified by Defendants does not preclude a finding of
23 | irreparable harm.

24 |          75.  In addition, Oakley's "Emerald" lenses were
25 | initially developed as a domestic Sunglass Hut exclusive, thus
26 | establishing the threat of consumer association with this vivid
27 | color and Defendants if not enjoined.  See Newcomb Decl. ¶ 9.
28 | Defendants' infringing products are sold in very close proximity

1    to Oakley's patented products.  See Taylor Decl. ¶ 4; Newcomb

2    Decl. ¶ 9.

3            76.  Defendants also acknowledge that they are prepared

4    to release "huge numbers of allegedly infringing models."  See

5    Defs. TRO Counterstatement, 9:9-24; Benassi Decl. ¶ 8; Giacobbi

6    Decl. ¶ 40.  These products are the subject of "extensive

7    marketing and promotional campaigns," including websites,

8    catalogs, ads, and advertising campaigns.  See Def. TRO

9    Counterstatement, 9:9-24.  Defendants acknowledge that they have

10   invested "millions of dollars" in this campaign.  See Def. TRO

11   Counterstatement, 9:9-24; Benassi Decl. ¶ 8.  Defendants include

12   manufacturers as well as retail locations, including over 2,200

13   retail locations in the United States and another 30,000

14   retailers to whom they sell their products.  See Giacobbi Decl. ¶

15   6; Def. TRO Counterstatement, 9:9-13.  Accordingly, the Court

16   finds that if the Defendants are not enjoined, there is a

17   likelihood of erosion to Oakley's market presence and its

18   goodwill associated with its patented lens coatings.

19           77.  For the foregoing reasons, the Court finds that

20   Oakley will likely be irreparably harmed if the preliminary

21   injunction does not issue.

22                    V. **BALANCE OF HARDSHIPS**

23           78.  The Court also finds that the balance of hardships

24   tips in Oakley's favor.  The Court does not doubt that an

25   injunction will cause Defendants some hardship.  However, the

26   hardship Defendants allege they would suffer is not unlike that

27   of any other party enjoined from infringing a valid patent.

28   //

# VI. **PUBLIC INTEREST**

79.   In patent cases there is an important public interest in favor of protecting the rights secured by a valid patent.  See Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1458 (Fed. Cir. 1988).  The focus of the court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief.  Id.  Because there is no "critical public interest" to counterbalance the public interest in protecting rights secured by valid patents, the Court finds the public interest also favors the grant of the preliminary injunction.

# VII. **BOND AMOUNT**

80.   Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, a successful movant for a TRO or preliminary injunction must post security "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

81.   It is Defendants' burden to reasonably estimate the extent to which they would be damaged if this preliminary injunction were improvidently granted.  See Equifax Services, Inc. v. Hitz, 905 F.2d 1355, 1362 (10th Cir. 1990) (court of appeals refrained from speculating on sufficiency of bond because defendant had failed to show "extent to which he would be harmed by an injunction").

82.   Defendants have requested different amounts of security from this Court.  On November 20, 2001, Defendants requested a bond of $100 million to secure the temporary restraining order.  See Defendants' Surreply to Oakley's Reply

1    Re: Application For TRO And Order To Show Cause Re: Preliminary

2    Injunction at 9.  On November 21, 2001, Defendants requested a

3    bond of $5 million to secure the temporary restraining order.

4    See Ex Parte Application To Dissolve Or Stay TRO Or Increase

5    Amount Of Surety Bond Pursuant To F.R.C.P. 65(b) at 9.   On

6    November 30, 2001, at the preliminary injunction hearing,

7    Defendants' counsel requested a bond of $10 million.  Defendants,

8    however, have not provided evidence to substantiate the necessity

9    of their requested bond amounts.

10          83.  The Court finds that a $100,000 bond is

11   appropriate under the circumstances of this case.

12

13          IT IS SO ORDERED.

14          The Clerk is directed to serve a copy of this Order on

15   all counsel of record.

16          Dated:  December _7_, 2001.

17

18

19                              _____

20                              ALICEMARIE H. STOTLER
                                UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28